Good morning everyone. We will take the cases up in the order in which they appear on the docket. The first three cases have been submitted on the briefs. Garginian v. Garland, Fernandez-Perez v. Garland, and Orozco-Lomeli v. Garland. So we will turn to Gregory Muren. Good morning, your honors. To please the courts, Gregory Muren for petitioners. I'd like to reserve two minutes of my time for rebuttal. Okay, please watch your clock. Your honors, this case is about California's request to extend its deadline to meet a 15-year-old health-based national air quality standard in the San Joaquin Valley, which is one of the most polluted regions in the country. The Clean Air Act requires this extension request to come with a plan to meet the relevant standard by the extended deadline in 2024. And because of the persistence of the air quality problem in the valley, the act also requires the state to demonstrate that the valley is implementing the most stringent measures that are in any state implementation plan or that have been achieved in practice in any state, so long as they're feasible in the region. Your honors, there are two fundamental problems with the state's plan that are the bases for petitioners' arguments here. And the first one is that it's more of a promise than a plan. So instead of a collection of measures and a demonstration of how those are implemented, it's more of an agreement. About a quarter of this plan is what's called an aggregate commitment, which is a promise to come up with the needed emission reductions by the deadline, and which in this case is accompanied by a strategy for achieving that commitment that is wholly unrealistic because of a multi-billion dollar budget shortfall. Could I ask an interim question, which is, are you arguing that the EPA cannot properly approve a plan that has aggregate commitments at all? The EPA points to language about schedules and timetables, I guess that's in 7410, and says, well, we can we can approve a plan, that has schedules and timetables for commitments in the future. So what's your position on that? Your honors, this case does not require you to rule on whether EPA can adopt aggregate commitments. What this case is really about is how the aggregate commitment at issue here, EPA effectively concedes, does the strategy to fulfill that commitment, it has a gap in it. Because of this massive funding shortfall, it doesn't get you all the way there. And so the issue is that, in this regard, is it so then you can see if it's okay to have aggregate commitments, right, under the act? This case doesn't, yeah, we aren't arguing that aggregate commitments are unlawful. We're arguing that an aggregate commitment without a realistic strategy to attain that commitment is unlawful. And the reason for that, your honor, is that you have to ask with regard to that gap in the commitment, you know, what is that? It's purely a promise from the state to do what it's already required to do under the law, which is attained by the deadline. And I think that hasn't the state set forth, I mean, the state set forth 15 tangible things it planned to do and was making progress in several of them, and the district set forth another 12 that it was doing, and it was making progress on those. Your honor, you know, I think if you look at the response to comments, the final rule and EPA's briefing, everyone recognizes that the incentive programs that make up more than half of this commitment, that are supposed to fulfill more than half of this commitment, are totally unrealistic because of this multi-billion dollar funding shortfall. And so, you know, what EPA's position is, sorry, your honor. Could you just, you said more than half. The EPA says it's only 10 percent or even less than that of the emission reductions, the 2.6 billion funding shortfall. Is that incorrect? I'm sorry, your honor, what I meant is that the incentive measures make up more than half of the aggregate commitment. And you're right that the funding shortfall within the incentive measures, EPA says it's about 7 or 8 percent of total emission reductions. And EPA says that's all right, but your honors, you know, EPA has total amount of a plan that you should rely on these aggregate commitments for. And in this case, well, they don't have any rule on that, right? The EPA says we don't, we have never promulgated a rule and you're merely looking at historical limits or historically what they've done. They said there's nothing that would prevent them from having more aggregate commitments. I think here it's 17 to 31 percent. Yes, your honor. So EPA has issued final rules for decades where it's consistently maintained that states should rely on commitments for no more than roughly 10 percent of total emission reductions. And so does that number come from though? I didn't quite, I read that in your brief and I do note that here they rely on 16.8 percent of NOx nitrous oxide reductions and 31.3 percent of direct PM 2.5 reductions. But is there anything anywhere that says they can't do that? No, your honors. But what they can't do is depart from their precedent in a final rule that they adopted pursuant to notice and comment without a reasoned explanation. And so the reason that they say, you know, 10 percent that we're not going to follow this 10 percent guideline in this case is because there have been a lot of measures that have already been adopted in the valley and it's hard to come up with new ones. And your honors, that has things precisely backwards. The fact that it is so hard to come up with new measures only makes these commitments seem more imposing and more difficult to fulfill. And that is precisely the opposite of what this limited requirement is about. It's precisely the opposite of what the three factor test is about, which is to provide guardrails for these commitments to ensure that they don't, you know, override the planning obligations in the Clean Air Act. So that is not the type of a reasoned explanation that the Clean Air Act requires. Mr. Mayor, are they allowed to consider specific information about the attainment area? So, for example, that this valley is on three sides hemmed in by mountains. There are inversions in the winter and that this makes it particularly difficult place to deal with these particulates. Is that something that the EPA can legitimately consider as it considers the plan? Absolutely, your honor. So what, you know, an EPA cited in its brief to a previous instance where in a rulemaking it had considered these, you know, issues about the valley. But the way that those issues have previously been considered is in this threshold question of whether you're allowed to use aggregate commitments at all and whether you apply the three factor test. Theoretically, you know, the idea behind this is, okay, it's difficult for the valley to come up with a plan in the first place. We'll allow them to use these commitments to defer implementation a little bit. But we need to put some guardrails around these commitments and that's why they need to be limited in scope. The state needs to be capable of achieving them. They need to be for a reasonable and appropriate period of time. And what EPA did here was something completely different. It said this difficulty, it's not only a reason to apply the test in the first place, it's a reason to and that's where EPA gets into trouble here. So if I may, your honor is going to pivot back to this statutory question about why a commitment without a strategy behind it is unlawful. In the second circuit case, environmental defense, the court considered whether a commitment fell validly within the scope of the planning sections of the Clean Air Act or whether it was an unlawful deferral of planning obligations. And what the court said was that the most important thing that it considered when it held that the commitment there was lawful was that it consisted of specific, I mean, it was supported by specific proposed measures that the state planned to implement to fulfill it. And what the court called that was, quote, a comprehensive and detailed plan for attainment. And your honors here, there is not a comprehensive plan for attainment because as EPA recognizes, this plan doesn't realistically get you all the way to 100% of emission reduction. And your honors, that getting all the way, providing fully for attainment is what sections 110A2A and 172C6 require. I have a question about that. I mean, this problem seems almost intractable. And I'm looking at some of the factors that the EPA is supposed to consider. And one of them is economically feasible. I mean, is it the case that these goals, attainment goals will ever really be able to be achieved in the San Joaquin Valley? Your honor, I mean, the law is the law. I think, you know, I don't know. I mean, I don't know what the best plan for the valley to implement is. And I don't know how it would go about doing it. The Clean Air Act requires the valley to come up with a plan. And if, you know, if the valley can't do that consistent with the law, then, you know, that's Congress's issue. That's not the court's issue. Could I ask a question about the reasonable amount of time argument? You indicate that the district intends to implement some of its committed measures after January 1st, 2024. The EPA says the district is not relying on those measures to demonstrate attainment. Do you disagree with that? To some extent, your honor. So what those measures are, in my understanding, is they're measures that are in the strategy that the state submitted for attaining the commitment. And what the state said was, we'll implement those before 2024, before the deadline, and they'll help us fulfill the commitment. And now the state is saying, well, we're actually not going to be able to implement those until 2024 after it's too late to help them fulfill the commitment. So it's just additional information that's showing that the state is not going to attain this, you know. And I mean, the information suggesting that is overwhelming, your honors. These $5 billion incentive measures that, again, make up more than half of the commitments are underfunded. EPA admits that they're going to be incredibly difficult to implement, even if they were funded. There's no backup plan. You know, the Valley has a recognized history of decades of regulatory failure with regard to fine particulate matter. And then, as you said, they're already pushing back measures. An additional issue I'd like to discuss, your honors, is the one of adequate funding. So section 110A2E of the act requires the state to provide assurances that its plans are adequately funded. And our argument here pretty straightforward. The state repeatedly and vociferously says that it doesn't have enough money to execute this plan. And EPA agrees that the only plan the state has is dramatically underfunded. And yet somehow EPA got from there to saying that there is an assurance of adequate funding. And your honors, that is contrary to common sense, contrary to the law. I'll briefly pivot as well to talk about our most stringent measures argument. So section 188E of the act requires the Valley to implement the most stringent feasible measures. And there are two kind of high level violations that we identified here. The first is that the Valley is defining the term measures inconsistently based on how the state asks it to define measures. And the second is that the Valley is not including specific requirements. It's defining measures in a way that does not include specific requirements, like a year round ban on uncertified heaters. And that is directly contrary to the statute, your honors. I'll leave the remainder of my time for rebuttal. Thank you. Thank you very much, council. Let's see, Ms. Isbar. May it please the court, Sarah Isbar for the EPA. I intend to share two minutes of my allocated time with district's counsel. Statistics have brought up a number of issues, both in their reply and just now in this hearing, and I'd like to address them. But before I do so, I want to make two overarching points. The first is that although we're discussing whether EPA's approval of the aggregate commitments, in particular, the commitments to propose certain instruments incentive based measures was lawful. It's important to take a step back and recognize that these commitments are a small part of the overall control strategy. The control strategy that EPA approved provides for attainment, primarily through baseline measures that have already been adopted and implemented. These baseline measures account for more than 80% of the nitrogen oxide emissions reductions needed, and about 65% of the PM 2.5 emissions reductions needed. The second point is that under the Clean Air Act and related regulations, EPA has a significant amount of discretion when evaluating the state's control strategy and request for an extension. EPA exercised that discretion reasonably. Its evaluation of the plan and the state's extension request was complex, nuanced, and highly technical. EPA does not take lightly that the San Juan area has a PM 2.5 NAAQS. Nowhere in our briefing do we dispute the magnitude of the health and environmental consequences associated with that classification. Many of the judgment calls embedded in EPA's approval do not have clearly verifiable answers, but that doesn't render EPA's judgment calls arbitrary and completion. Under the Clean Air Act, plans allow for commitments even for shortfall. Could I ask about the funding shortfall which the EPA concedes? There is at least a $2.1 billion funding shortfall for the incentive program, which is 10% of the emission reductions. When I reviewed your response to that in your briefing, you seemed to concede the shortfall, but say, well, it's possible the state could make up for that in some other way. You list some other possible ways that they might be able to make up for it. Obviously, that's not a plan. It's not a commitment to do that. It's not really stated in the plan. What are we to make of this conceded at least $2.1 billion shortfall in part of their commitment for meeting the emission reductions? EPA absolutely recognizes that there is a shortfall when it comes to the incentive-based measures, but when evaluating the second factor of the two-factor test, which is whether the state is capable of fulfilling its commitments, funding was one consideration of evaluating whether the commitments could be fulfilled. EPA looked at funding through a commitment to propose incentive-based measures. The aggregate commitments in their totality include commitments to propose the regulatory and incentive-based measures. Also, CARB in particular has committed to proposing substitute measures in the event that those incentive-based measures don't achieve the necessary reductions. On top of that, can I just stop you right there? The substitute measures aren't concrete. Those aren't articulated in this plan. That to me sounds like the promise or the plan to plan that petitioners are arguing is in this plan. Substitute measures are something that EPA has approved in the past. If you look at the Committee for a Better Arvin case, in that case, those commitments contained both specific to propose and adopt specific measures or appropriate substitute measures. On top of that, there are also the tonnage commitments, which are commitments to achieve specific emissions reductions by a date certain on a schedule. The tonnage commitments act as a backstop to ensure that if the incentive-based measures don't achieve the necessary emissions reductions. I thought the plan was to explain how the district was going to attain compliance. What you're saying is, people just say that they're committed to attaining compliance and we don't need to tell you exactly how. We have a gap and we won't tell you how they're going to do it, but they promise they'll do it. That's enough. Is that all you have there? No, Your Honor. The attainment plan that was approved by EPA includes not just the incentive-based measures. If it were just the incentive-based measures and there was no explanation of what to do with that funding gap, then I agree that that particular plan would not be a plausible attainment plan. But here, we've got three different aspects of the aggregate commitments. With the incentive-based measures and the substitute measures and the tonnage commitments, EPA looked at all of that and determined that it was reasonable that even if there was a funding gap, that did not automatically translate into an emissions gap. If there was only the $2.1 billion incentive program and nothing and then just the rest of the plan as is currently stated, would the district reach the attainment for emission reductions? So, nothing else was done other than what's set out in the plan and the $2.1 billion funding shortfall. I think under those circumstances and based on my understanding of the record, it would be highly unlikely for EPA to approve that kind of plan. And so, what they said was, we've promised to do other things, but we're not going to expressly list them for you. Your Honor, I believe the record reflects that the district and the state did not simply promise to do other things. They set forth the substitute measures that you identified in that letter. That's also in the record. But more importantly, the commitments are enforceable. And so, the commitment to propose incentive-based measures, the substitute commitments, and the tonnage commitments, they all go into the CFR, into a regulation. And if they miss any of those commitments, a citizen, the state, or EPA could enforce those commitments. And so, it's not just merely a promise to attain, which is what is not enforceable. These are all enforceable commitments. Well, everything in the plan is, but what they're going to do in order to make up for the $2.1 billion or the $2.6 billion funding shortfall is not in the plan, as I understand it. But the EPA just says, well, we don't know. There are contingencies that might help the district out there. That's correct, Your Honor. EPA recognizes the shortfall may not be as large as CARB itself estimated. But when EPA was reviewing the commitments, it did not conclude that a funding shortfall in this one particular area was enough to conclude that the state overall couldn't meet its commitments because the commitments included other aspects, like the substitute measures and the tonnage commitment. And in doing, in looking at- Can I take you back to your first comment about the baseline that this is? So, what baseline are you talking about? I'm referring to measures that have already been implemented and that will continue to have a lasting effect. So, there were a number of different control measures, and a lot of them were discussed in the briefing, like rules about wood-burning devices and flares or, you know, gas-powered furnaces. And all of those different rules that have been implemented in the past will continue to have emissions reductions going forward. And the plan reasonably relies upon those baseline emission control measures to achieve the bulk of the attainment in the plan. So, the argument is this isn't brand new, starting all over. We're relying on these past rules as part of this plan. Yes, Your Honor. There was one additional control measure that was included in the plan. But if you look at Table 1 of the final rule, it kind of outlines the plan for attainment, which includes baseline control measures, and it also includes the one additional control measure and then the aggregate commitments is the third piece to that. Okay. I'd also like to talk a little bit about why EPA concluded that the state was capable of fulfilling its commitments. EPA looked at both the progress that the state had made in achieving these particular commitments, but it also looked at past progress in other plans. And I want to clarify that in Petitioner's reply brief, Petitioner seems to suggest that the fact that the valley itself is in non-attainment is a reason to conclude that the state is not capable of fulfilling its commitments. But the measure that EPA looked at was whether the state was capable of fulfilling its commitments and attainment itself was not the measure that the agency looked at. And I'd also like to address a little bit the best available control measure analysis and also the most stringent measure analysis. Can you address the hotspot analysis, why it's okay to employ the most stringent measures in some places within the district, but not in others, even though it's available? Yes, Your Honor. So most stringent measure is term of art and the regulation does not require that the most possible amount of emissions reductions possible be implemented. What it looks at is a comparison between what is in practice in other states and other air districts and then also, or what's feasible or in practice in other areas. And so here, EPA concluded that increasing the stringency of a measure could constitute an MSM, sorry, I'm sorry for using the acronym, but it could constitute MSM in the sense that because those control emissions in the hotspot strategy aren't in place in other areas, that implementing the hotspot strategy could constitute MSM. So I want to speak specifically to this concept of measure that has come up in the briefing. So whether the measure itself is important, sorry, I want to speak to one issue about what measure actually means. So EPA has evaluated measure in a particular context and it doesn't take the narrow definition that petitioners have taken here. There is no specific regulation that EPA relied upon, or sorry, there is no specific regulatory meaning of measure and EPA in its discretion reasonably concluded that when it looked at control measures that different, sorry, excuse me, EPA when evaluating the control measures reasonably concluded that it, are you all right? Are you okay? Yeah, yes, I'm fine. Thank you. Sorry. So with respect to the best available control measures and the most stringent measures analysis, petitioners took the position that measure has a rigid and narrow meaning of an individual requirement within a rule. This reading of measure is not tenable nor supported by any authority. It's also inconsistent with the way measure has been used throughout this rulemaking. EPA's position is a better reading. For a general word like measure, which can have a broad array of meanings, the context matters. Here, there's no question that when EPA has used the term measure, it has referred to the various rules and incentive-based programs adopted by the district. It did this through the rulemaking process. First, in the context of analyzing the baseline measures, EPA referred to rules and not the individual requirements or provisions within a rule. And also in the context of analyzing the commitments to propose measures, EPA referred to rules as measures, not the individual requirements within the rule. And in the various rules as measures to determine whether they met the BACM and MSM requirements. This is a position that is within EPA's discretion to take. As EPA addressed extensively in the response to comments, EPA makes the determination as to how to compare the stringency of different control measures. Petitioners' interpretation that MSM requires a line-by-line comparison of individual requirements because that's what measure means is inconsistent with the way measure has been used throughout the entire approval process and is not supported by the statute or the regulations. All right, Council, I think you're over your time, but I will give Ms. Bellator-Williamson two minutes. Thank you. Thank you, Your Honor. I appreciate that. May I please coordinate Bellator-Williamson for intervener and respondent, San Joaquin Valley Air Pollution Control District. The Clean Air Act's approach to cooperative federalism anticipates that states will tailor their programs to their unique circumstances. The district's employees, all of whom live and breathe the air of the San Joaquin Valley, myself included, have put in the work over the past two decades to develop eight separate PM2.5 SIPs for EPA's approval, each one building on the other, incorporating the latest control technology science that can technologically and economically be feasibly implemented. District staff know how to put together a plan that meets all of the requirements of the Clean Air Act, and this plan does so. Over the past several decades, the district has reduced emissions from stationary sources by 85%, and between 1990 and 2017, the district has reduced peak 24-hour PM2.5 design values by 43%, despite the exceptionally challenging geography and drought conditions that we experience. The district is currently in attainment of the 1997 24-hour PM2.5 standard, and since this plan was adopted in 2018 and put into motion, four of the eight counties of the San Joaquin Valley are breathing the air guaranteed by the 2006 PM2.5 standard, and of the remaining four, the monitors are very, very close to showing attainment. EPA's approval of this SIP was based upon its own independent and very thorough analysis. It was not arbitrary and capricious. For the aggregate commitment, the state and the district were well on their way towards adopting the measures needed to fulfill the emission reduction commitment when EPA approved the plan, and since that time have adopted enough measures, including an additional substitute measure to exceed the emission reduction commitment. As we stand here today, the quantity of emissions reductions promised in that commitment are being filled. And to address just briefly, I want to touch on the court's questions about inadequate funding. The enforceable commitments didn't, it wasn't a funding commitment. It was an emission reduction commitment based upon specified controls and incentive programs identified in that plan were, in hindsight, overestimates, but as this court held in trustees for Alaska versus Fink, SIP commitments conditioned on seeking out available funding are allowable under the Clean Air Act. And then just briefly, EPA's BACM and MSM determinations are also science-based decisions where the discretion afforded to EPA should be most deferential. Again, they followed a very balanced analytical approach, not arbitrary and capricious. So I just want to conclude by emphasizing that this plan is getting the reductions needed to reach attainment. Petitioners here should not be able to substitute their opinions for that of the experts at the district, the state, and EPA. I'm happy to answer any questions. Thank you. Thank you, counsel. Mr. Murren? Yes, your honor. So I want to talk about a question that Judge Okuda asked that I think really gets at the nub of this commitments issue, which is, you know, I thought that these were, to paraphrase, I thought that these were state implementation plans that were supposed to describe how you're going to attain national air quality standards. You know, they're required to be developed years before attainment. Section 107A of the act says that they have to describe the manner in which that the state is going to attain. And so for EPA now to say that a promise, a gap in a state implementation plan, that it consists of just the state saying we're going to attain, that that is enough to constitute a valid element or part of a plan. I mean, that has major implications. That is, that's a big, that's a big deal for interpreting the act. If you look at sections 110A and 172C6 and read it to say that a promise is a valid element, a promise without any, you know, substitute measures is a valid element of a state implementation plan, that really takes the bite out of the statute. That is a huge hole in the planning obligations under the act. I'll shift gears a little bit and talk about the most stringent measures issue. There's, you know, on the definition of most stringent measures, there's one thing that I really want to highlight that I think we didn't, we didn't in our briefs, which is that the definition of most stringent measures under section 188E requires the state and EPA to analyze the feasibility of measures. And, you know, EPA argues that, well, a measure is the combination of 20 requirements or, you know, can be 30 requirements or whatever. And I just want to, want to highlight, you can't analyze feasibility of 20 requirements together. You analyze that on a requirement by requirement basis. That's the only way it makes sense. So I'll rest your honors. Thank you. Thank you very much, counsel. Medical advocates for healthy care for CCPA will be submitted.
judges: WARDLAW, IKUTA, BADE